## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 22-cr-124 (NEB/TNL) |
| Plaintiff, | |
| v. | **ORDER** |
| Abdiaziz Shafii Farah (1),<br>Mohamed Jama Ismail (2),<br>Mahad Ibrahim (3),<br>Abdimajid Mohamed Nur (4),<br>Said Shafii Farah (5),<br>Abdiwahab Maalim Aftin (6),<br>Mukhtar Mohamed Shariff (7), and<br>Hayat Mohamed Nur (8), | |
| Defendants. | |

Chelsea A. Walcker, Craig R. Baune, Harry Jacobs, Joseph H. Thompson, and Matthew S. Ebert, Assistant United States Attorneys, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government);

Andrew S. Birrell and Ian S. Birrell, Birrell Law Firm, PLLC, 333 South Seventh Street, Suite 3020, Minneapolis, MN 55402 (for Defendant Abdiaziz Shafii Farah);

Patrick L. Cotter, Sieben & Cotter, PLLC, 105 Hardman Court, Suite 110, South Saint Paul, MN 55075 (for Defendant Mohamed Jama Ismail);

William R. Dooling and William J. Mauzy, Mauzy Law Office, P.A., 650 Third Avenue South, Suite 260, Minneapolis, MN 55402 (for Defendant Mahad Ibrahim);

Marsh J. Halberg, Halberg Criminal Defense, 7900 Xerxes Avenue South, Suite 1700, Bloomington, MN 55431; Edward V. Sapone, Sapone & Petrillo, LLP, 40 Fulton Street, Seventeenth Floor, New York, NY 10038; and Michael Vitaliano, The Vitaliano Law Firm, PLLC, 1492 Victory Boulevard, Staten Island, NY 10301 (for Defendant Abdimajid Mohamed Nur);

Clayton Carlson and Steven L. Schleicher, Maslon LLP, 90 South Seventh Street, Suite 3300, Minneapolis, MN 55402 (for Defendant Said Shafii Farah);

Andrew S. Garvis, Koch & Garvis, 3109 Hennepin Avenue South, Minneapolis, MN 55408 (for Defendant Abdiwahab Maalim Aftin);

Andrew H. Mohring and Frederick J. Goetz, Goetz and Eckland P.A., 615 First Avenue Northeast, Suite 425, Minneapolis, MN 55413 (for Defendant Mukhtar Mohamed Shariff); and

Michael J. Brandt, Brandt Criminal Defense, 2150 Third Avenue, Suite 210, Anoka, MN 55303 (for Defendant Hayat Mohamed Nur).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on several pretrial motions filed by Defendants Abdiaziz Shafii Farah, Mohamed Jama Ismail, Mahad Ibrahim, Said Shafii Farah, Abdiwahab Maalim Aftin, and Mukhtar Mohamed Shariff.

A hearing was held on August 21, 2023. ECF No. 290. Harry Jacobs and Matthew S. Ebert appeared on behalf of the United States of America (the "Government"). Ian S. Birrell appeared on behalf of Abdiaziz Shafii Farah. Patrick L. Cotter appeared on behalf of Mohamed Jama Ismail. William R. Dooling and William J. Mauzy appeared on behalf of Mahad Ibrahim. Marsh Halberg appeared on behalf of Abdimajid Mohamed Nur. Clayton Carlson and Steven S. Schleicher appeared on behalf of Said Shafii Farah. Andrew S. Garvis appeared on behalf of Abdiwahab Maalim Aftin. Andrew H. Mohring and Frederick J. Goetz appeared on behalf of Mukhtar Mohamed Shariff. Michael J. Brandt appeared on behalf of Hayat Mohamed Nur.

The Court has categorized the issues as follows: (I) expert discovery; (II) collective motions by certain of Defendants; and (III) motions to sever Defendants from one another, to sever counts, and for a bill of particulars filed by certain Defendants individually. Based upon the record, memoranda, and oral arguments of counsel, **IT IS HEREBY ORDERED** as follows:

## I. EXPERT DISCOVERY

Previously, the Court issued an Order on Pretrial Disclosure & Preservation, which set forth, among other things, deadlines for expert disclosures. ECF No. 139 at 5.[1] The deadline for principal expert disclosures was set at 45 days before trial and the deadline for rebuttal experts was set at 30 days before trial. ECF No. 139 at 5. The Order on Pretrial Disclosure & Preservation provided that a party could "seek modification of the requirements set forth [t]herein by filing a motion . . . by the . . . deadline for filing pretrial motions." ECF No. 139 at 3.

In declarations by counsel, Mohamed Jama Ismail, Abdiwahab Maalim Aftin, and Mukhtar Mohamed Shariff request that the deadline for principal experts be expanded to 60 days before trial and the deadline for rebuttal experts remain at 30 days before trial due to the nature and complexity of this case. ECF No. 254 at 4; ECF No. 247 at 6; ECF No. 228 at 5.

At the hearing, when the Court inquired as to whether there was any agreement on the time for expert disclosures, the parties requested additional time for discussion in connection with the district court's order that the parties file a joint proposed trial plan.

---

[1] The Court cites to the pagination generated by the Court's electronic filing system.

*See* Tr. 77:21-80:21, ECF No. 293. In their letters to the district court, Abdiaziz Shafii Farah, Mohamed Jama Ismail, Said Shafii Farah, Abdiwahab Maalim Aftin, and Mukhtar Mohamed Shariff maintain that the requested expansion of 60 days for initial experts followed by 30 days for rebuttal experts is appropriate under the circumstances. *See generally* ECF No. 295. The Government maintains that the existing schedule is sufficient. *See generally* ECF No. 296.

There is good cause for modification of the deadline for principal expert disclosures. *See* Fed. R. Crim. P. 16(a)(1)(G)(ii) (time for expert disclosures "must be sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence"). Accordingly, no later than 60 days prior to trial, the parties shall make their principal expert disclosures, and, no later than 30 days prior to trial, the parties shall make any rebuttal expert disclosures. Fed. R. Crim. P. 16(a)(1)(G)(ii), (b)(1)(C)(ii).

## II. COLLECTIVE MOTIONS

Abdiaziz Shafii Farah, Mohamed Jama Ismail, Mahad Ibrahim, Said Shafii Farah, Abdiwahab Maalim Aftin, and Mukhtar Mohamed Shariff have collectively filed the following motions: Defendants' Joint Motion for Discovery Relief, ECF No. 241; Defendants' Joint Motion for Discovery, ECF No. 229; Defendants' Joint Motion for *Brady* Material, ECF No. 230; and Motion to Disclose and Make Informant Available for Interview, ECF No. 233.[2]

---

[2] Abdiwahab Maalim Aftin also individually filed a Motion for Disclosure of Confidential Informant, ECF No. 246. At the hearing, Abdiwahab Maalim Aftin rested on the arguments made in connection with the collective motion addressing informants. Tr. 86:20-87:3.

### A. Defendants' Joint Motion for Discovery Relief, ECF No. 241, is GRANTED IN PART as set forth herein and OTHERWISE DENIED.

This is one of several related cases involving an alleged massive fraudulent scheme to obtain and misappropriate collectively more than $250 million in federal child nutrition program funds. ECF No. 111 at 1-2. There are more than 11 related cases involving over 50 defendants.[3] This case involves 8 defendants and $40 million. *See generally* ECF No. 57.

This case and other related matters were previously designated as complex under 18 U.S.C. § 3161(h)(7)(B)(ii) in part because of "the large volume of discovery, the nature of the evidence collected, and the multiple issues involved in the discovery process." ECF No. 125 at 3. In support of its motion that this case be designated as complex, the Government reported

> that the discovery in this matter is exceptionally voluminous and includes millions of pages of investigative materials. "[T]he grand jury issued more than 600 subpoenas," and "[t]he responses to these subpoenas include financial statements and other records for hundreds of bank accounts and credit card merchant accounts." ECF No. 111 at 3. "The [G]overnment interviewed hundreds of witnesses and individuals involved in the fraud scheme, and will be producing hundreds of reports documenting those interviews." ECF No. 111 at 3. "The [G]overnment obtained and executed physical search warrants for 32 businesses and residences," during which "the [G]overnment seized approximately 380 electronic devices, including computers,

---

[3] *See, e.g., United States v. Abdiaziz Shafii Farah et al.*, No. 22-cr-124 (NEB/TNL) (8 defendants); *United States v. Liban Yasin Alishire et al.*, No. 22-cr-222 (NEB/TNL) (3 defendants); *United States v. Aimee Marie Bock et al.*, No. 22-cr-223 (NEB/TNL) (14 defendants); *United States v. Qamar Ahmed Hassan et al.*, No. 22-cr-224 (NEB/TNL) (8 defendants); *United States v. Sharmake Jama et al.*, No. 22-cr-225 (NEB/TNL) (6 defendants); *United States v. Haji Osman Salad et al.*, No. 22-cr-226 (NEB/TNL) (9 defendants); *United States v. Mekfira Hussein et al.*, No. 22-cr-277 (NEB/TNL) (2 defendants); *United States v. Mohamed Muse Noor*, No. 22-cr-293 (NEB/TNL); *United States v. Ayan Farah Abukar*, No. 23-cr-80 (NEB/TNL); *United States v. Sade Osman Hashi*, No. 23-cr-81 (NEB/TNL); *United States v. Sharon Ross*, No. 23-cr-82 (NEB/TNL).

> laptops, and cell phones."    ECF No. 111 at 3.    "The
> [G]overnment also obtained warrants to search more than 45
> email accounts, through which the [G]overnment obtained
> more than 250,000 emails relevant to the investigation."  ECF
> No. 111 at 3.

ECF No. 125 at 1-2.    The Court subsequently appointed a coordinating discovery

attorney to assist Defendants "with court-appointed counsel in this case."[4]  ECF No. 172

at 1.  The functions of the coordinating discovery attorney are largely logistical, including

but not limited to distributing and facilitating the exchange of discovery, evaluating the

sorts of technology needed for the discovery, and assessing whether vendor support may

be needed.  *See* ECF No. 172 at 1-2.

    As further described at the hearing, discovery produced in this matter has

consisted of

> 2.8 million pages of disclosed evidence, about 40 hours of
> recordings, about 10,000 miscellaneous files like
> spreadsheets, copies of about 170 seized electronic devices,
> tax records for 36 entities or addresses, and about 8 terabytes
> . . . of camera footage.

Tr. 18:16-21; *see also* ECF No. 278 at 5 ("The [G]overnment has produced to defense

counsel essentially everything it has collected during the case, including reports of all

witness interviews, transcripts of all grand jury testimony, and returns obtained from

hundreds of grand jury subpoenas.").  Based on the record before the Court, as described

at the hearing and further reflected in sealed Government Exhibit A introduced at the

hearing, the discovery produced by the Government has been in large part wholesale

---

[4] The majority of Defendants in this matter have retained counsel.  The extent to which the services of the coordinating discovery attorney are "accessible to" retained (as opposed to court-appointed) counsel as a practical matter is not entirely clear from the record.  *See* Tr. 32:13-20.

across these related cases, and not specific to the individual case. Tr. 24:6-11 ("I would just note that the discovery received as outlined by Mr. Birrell is not even indictment-specific. As the Court noted at the beginning, there's at least six separate indictments here. The discovery includes all of those indictments."), 25:22-24 ("This is a copy of the first of two discovery indexes that have been tendered in these cases."); *see generally* Gov't Ex. A. Indeed, a quick glance at Government Exhibit A, which is one of at least two discovery indexes that have been provided by the Government in these cases, reveals that the Government's disclosures have encompassed *at minimum* 7 different cases, including this one, which translates into information involving at least 50 defendants and more than 260 counts. *See* Tr. 24:19-25:25; Gov't Ex. A; *see generally* ECF No. 57 (43 counts); ECF No. 1 in No. 22-cr-222 (21 counts); ECF No. 1 in No. 22-cr-223 (61 counts); ECF No. 1 in No. 22-cr-224 (22 counts); ECF No. 1 in 22-cr-225 (29 counts); ECF No. 93 in No. 22-cr-226 (69 counts); ECF No. 31 in No. 22-cr-277 (20 counts).

Defendants assert that "the quantity and form of [discovery] disclosure[s in this matter] impose an unfair burden on [their c]onstitutional rights." ECF No. 241 at 2. Defendants assert that they are unable to "meaningfully review the discovery" and pertinent information, including *Brady* information, "is effectively lost in the massive amount of data." ECF No. 241 at 2. As a result, Defendants assert that they "cannot understand how the case would proceed, cannot make informed decisions about strategy, and cannot make other critical pretrial decisions." ECF No. 241 at 3. Defendants request that the Court order the Government to (1) "produce targeted discovery, specifically identifying documents directly relevant to the charges and issues in the case"; (2) "assist

7

[Defendants] in locating key documents by highlighting the relevant documents within the voluminous discovery materials"; and (3) disclose its "witness and exhibit lists early." ECF No. 241 at 1.

The Government opposes Defendants' motion.  ECF No. 311 at 7; *see* ECF No. 278 at 3.  The Government contends that it has gone beyond its obligations under Rule 16 of the Federal Rules of Criminal Procedure and its production fully comports with constitutional requirements.  The Government points out that "[t]he vast majority of the discovery produced is in electronic form, which enables . . . [D]efendants to conduct narrowly tailored searches to quickly locate documents," such as "by name or email address"; it has provided "a detailed discovery index accompanying [its] productions to aid . . . [D]efendants in reviewing the discovery"; and it has "Bates stamped the documents with prefixes to indicate the source of the discovery materials."  ECF No. 311 at 8.  The Government additionally points out that, "[w]ithin the grand jury-related discovery, [it] provided . . . [D]efendants with a detailed roadmap of the evidence through specific exhibits pertaining to each of the charged counts."  ECF No. 311 at 8.  The Government also relies on the appointment of the coordinating discovery attorney and states that it "has been responsive to any questions raised by defense counsel, such as the ability to access documents."  ECF No. 311 at 8-9.

At the hearing, the Government explained that Government Exhibit A is "incredibly detailed":

> It breaks it down by first the type of evidence, whether it's an item in response to a grand jury subpoena, for example. Within that category, it describes the party that produced the

> records.  The column after that even identifies the particular
> subject, in other words, the particular party, which could even
> be one of the named defendants, that the defendant [sic] has
> identified for the defendants is implicated by that particular
> set of records.  It then further provides a specified date range
> for each of those.

Tr. 30:11-19; *see also* Tr. 31:4-12 ("But the index goes on in further detail, Your Honor,

to then separate out—and these are tabbed in an Excel spreadsheet—other sources of

evidence, including interview reports.  And then in the same manner I just described,

Your Honor, would further detail for each defense counsel the particular item at issue

with that report, the person interviewed, for example, as well as the Bates range.  This

continues for other categories of evidence: [g]rand jury transcripts, audio visual records,

for example.").  The Government also noted that, "[w]ithin the grand jury transcript

items, there are also particular exhibits that pertain to charged counts."  Tr. 31:13-14.

According to the Government, "[l]iterally in a matter of minutes, anyone, including

someone who is not intimately familiar with his or her own defendant's particular

conduct, could do a word search within this index and easily come upon a subset of

documents that implicate or involve that particular defendant."  Tr. 30:24-31:3.  The

Government also stated that "while the discovery is voluminous, the alleged fraud itself

was sprawling," Tr. 33:15-17, and Defendants "therefore, perhaps better than almost

anyone in this room, are best suited to know their own alleged conduct," Tr. 34:1-3.

In post-hearing briefing, Defendants explain that some of the entries in

Government Exhibit A are sufficiently detailed, but many "appl[y a] single label[] across

hundreds of thousands of pages of data."  ECF No. 302 at 4.  Defendants assert that it is

not clear from the entries which of the documents within the specified Bates range "have to do with the case at hand."  ECF No. 302 at 4; *see also* ECF No. 302 at 5.  Thus, while Defendants may be able to perform a search to get to a particular entry, the entry is just "the tip of an informational iceberg," without providing any sort of meaningful disclosure of information pertinent to this case.  ECF No. 302 at 5.

This Court has broad discretion in administering discovery in criminal matters. *See, e.g.*, *United States v. Hoeffener*, 950 F.3d 1037, 1043 (8th Cir. 2020);  *United States v. Olivares*, 843 F.3d 752, 757 (8th Cir. 2016); *cf.* Fed. R. Crim. P. 16 advisory committee's note to 1974 amendment (Rule 16 "is intended to prescribe the minimum amount of discovery to which the parties are entitled.  It is not intended to limit the judge's discretion to order broader discovery in appropriate cases.").  Additionally, Rule 16.1(b) of the Federal Rules of Criminal Procedure allows a party to "ask the court to determine or modify the time, place, manner, or other aspects of disclosure to facilitate preparation for trial."  *See also* Fed. R. Crim. P. 16(d)(1) (court may issue orders regulating discovery for good cause shown).  The Rules themselves advise that they "are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay."  Fed. R. Crim. P. 2.

First, this Court finds it "important to note at the outset what this motion is *not*." *United States v. Omidi*, No. CR 17-661(A)-DMG, 2021 WL 7629896, at *2 (C.D. Cal. Sept. 1, 2021).  Defendants do not contend that "the Government has failed to meet its discovery obligations."  *Id.*  Nor do Defendants contend that the Government has acted in

bad faith.  *See* ECF No. 241 at 2 ("applaud[ing] the [G]overnment for making fulsome disclosures").   Rather, Defendants' motion is driven "by the massive quantity of government disclosures already made and those to be made in the future."  ECF No. 241 at 1.

Second, neither Defendants nor the Government has identified for this Court binding precedent on how to resolve the matter at hand.  Under Rule 16(a)(1)(E), the Government is required to disclose items within its possession, custody, or control, that are "material to preparing the defense"; the Government intends to introduce "in its case-in-chief"; or were "obtained from or belong[] to the defendant."  The Government has identified a case from this District, *United States v. Cole*, No. 09-cr-193 (MJD/AJB), in which a defendant requested that the Government be ordered "to specifically identify materials it intends to use at trial in this matter" based on the "extensive discovery materials" produced and "open[-]file approach" utilized by the Government.  ECF No. 107 at 2 in No. 09-cr-193 (D. Minn. Nov. 30, 2009).  The motion was denied on grounds that "Rule 16 establishes the government's obligation to produce, but does not impose a duty to identify those documents to be used at trial."  ECF No. 107 at 2 in No. 09-cr-193.  The defendant's request was also seen as seeking early disclosure of the Government's exhibit list.  ECF No. 107 at 4 in No. 09-cr-193.  Other courts have similarly observed that Rule 16(a)(1)(E) "does not require the government to make specific identification of its case-in-chief documents separately from the other two categories of documents required to be produced."  *United States v. Parker*, No. 1:05-CR-0045-ODE-ECS, 2005 WL 8162816, at *1 (N.D. Ga. June 10, 2005); *see, e.g.*, *United States v. Prince*, 618 F.3d

11

551, 562 (6th Cir. 2010) ("Rule 16 does not entitle a defendant to pretrial disclosure of the government's exhibit list."); *see also, e.g.*, *United States v. Newman*, No. 3:19-CR-59-TAV-DCP, 2020 WL 7294644, at *5 (E.D. Tenn. Dec. 10, 2020); *United States v. Blankenship*, No. 3:14-CR-124, 2015 WL 4561458, at *5 (E.D. Tenn. July 29, 2015); *United States v. Perraud*, No. 09-60129-CR, 2010 WL 228013, at *9-10 (S.D. Fla. Jan. 14, 2010); *United States v. Causey*, 356 F. Supp. 2d 681, 686-87 (S.D. Tex. 2005); *United States v. Scrushy*, No. CR-03-BE-530-S, 2004 WL 483264, at *2-3 (N.D. Ala. Mar. 3, 2004).

Third, courts have long struggled with what sorts of remedies, if any at all, are appropriate in cases with voluminous discovery.  *Compare, e.g.*, *Omidi*, 2021 WL 7629896, at *1-3; *United States v. Contech Engineered Sols. LLC*, No. 5:20-CR-481-FL-2, 2021 WL 714991, at *1-5 (E.D. N.C. Feb. 18, 2021) [hereinafter *Contech*]; *United States v. Saffarinia*, 424 F. Supp. 3d 46, 82-91 (D. D.C. 2020); *United States v. Anderson*, 416 F. Supp. 2d 110, 113-16 (D. D.C. 2006); *United States v. Hsia*, 24 F. Supp. 2d 14, 28-30 (D. D.C. 1998); *United States v. McDade*, No. 92-249, 1992 WL 382351, at *1-2 (E.D. Penn. Dec. 11, 1992); *United States v. Poindexter*, 727 F. Supp. 1470, 1484 (D. D.C. 1989); *United States v. Turkish*, 458 F. Supp. 874, 882 (S.D. N.Y. 1978), *with, e.g.*, *United States v. Sotomayor*, No. 1:22-cr-122 (RDA), 2022 WL 17363020, at *2-4 (E.D. Va. Dec. 1, 2022); *United States v. Meek*, No. 1:19-cr-00378-JMS-MJD, 2021 WL 1049773, at *2-6 (S.D. Ind. Mar. 19, 2021); *Newman*, 2020 WL 7294644, at *4-7; *United States v. Satary*, No. 19-197, 2020 WL 5850163, at *9-11 (E.D. La. Oct. 1, 2020); *Parker*, 2005 WL 8162816, at *1-2; *Blankenship*, 2015 WL 4561458, at *5-8; *Perraud*,

2010 WL 228013, at *11-12; *Causey*, 356 F. Supp. 2d at 683-92; *Scrushy*, 2004 WL 483264, at *2-3.  As aptly summarized in *Contech*,

> [d]ecisions appear to be fact-bound and turn on the actions taken by the Government to facilitate the defendant's review of the production, such as whether the production is searchable and whether the Government has provided detailed indices, lists of key documents, a list of evidence the Government expects to present at trial, and any other assistance to the defendant in navigating the production.

2021 WL 714991, at *4; *see also Newman*, 2020 WL 7294644, at *6 (distinguishing older cases on grounds that they "occurred when technological capabilities to examine larger amounts of data were inadequate").  And, suffice it to say, good and well-reasoned arguments abound.

Acknowledging "the difficulty the defense is having in attempting to pull a probative needle or two out of the many large proverbial haystacks which the government has made available," *McDade* took an "intermediate approach."  1992 WL 382351, at *2. Rather than order the Government "to disclose lists of exhibits and other documents on which it intend[ed] to rely at trial," the court in *McDade* ordered the Government, "to the best of its good-faith ability, to tell the defense of any discrete parcels of material that it does *not* plan to use at trial."  *Id.*  In doing so, the *McDade* court emphasized that it was "expressly *not* telling the government to reveal to the defense exactly what it intends to use at trial."  *Id.*  The *McDade* court explained:

> What I am directing is that, to continue with the trite, bucolic metaphor, if the government does in fact know that of the, say, 27 empirical haystacks which it has forked over to the defense, there are 11 haystacks, for example, which the government views as being so far afield from the focus of the

> trial that it does not intend to use them, then the cause of
> speedy and efficient justice would be furthered by the
> government's telling the defense about those 11 haystacks
> which contain no needles.

*Id.  Contech* similarly followed *McDade*'s "negative-identification approach."  *Id.*; *see*

*Contech*, 2021 WL 714991, at \*4-5; *see also United States v. Cason*, No. 1:15-cr-30,

2015 WL 4878790, at \*7 (N.D. W. Va. Aug. 7, 2015).  As explained in *Contech*, the

negative-identification approach "should significantly reduce the universe of documents

[a defendant] has to review, but it does not require the government to propose its trial

exhibit list too early."  2021 WL 714991, at \*5.

Here, Defendants face similar, if not significantly larger, proverbial haystacks.

Indeed, it is undisputed that the Government's disclosures encompass multiple cases

beyond the instant case.  And, while the Court agrees that Government Exhibit A, the

exemplar discovery index, is detailed in the sense that it identifies, for example, the

source of the information, the subjects[5] to which the information pertains, and the

applicable Bates pages for the responsive documents, the categorical approach employed

in the index renders such detail largely meaningless when a single entry refers to multiple

subjects and several hundred—if not thousands, if not hundreds of thousands—or more

pages.  *See, e.g.*, Gov't Ex. A at 0005 (9 subjects, more than 800 pages), 0017 (8 subjects,

more than 700 pages), 0023 (4 subjects, more than 2,400 pages), 0027 (more than 20

subjects, more than 350 pages), 0037 (8 subjects, more than 6,100 pages), 0140 (more

---

[5] While at times the "subject" is as clear as a particular defendant, it is often less so or so generic that it is not clear whether the information applies to this case, a related case, or some combination thereof.

than 40 subjects, more than 500 pages), 0245 (more than 40 subjects, more than 480 pages), 0255 (more than 40 subjects, more than 306,000 pages).

The Court appreciates that Defendants are not detained.  The Court also appreciates that seasoned members of this Court's defense bar have been retained in this case.  The Court further appreciates that all defense counsel may have, to some extent, benefitted from the coordinating discovery attorney's logistical efforts on behalf of those Defendants with court-appointed counsel.  The Court does not doubt that the Government had good reasons for making disclosures in the manner that it did and, again, there is no claim that the Government has acted in bad faith or has padded the disclosures for purposes of frustrating Defendants' review of the information.  Nor does the Court discount the Government's efforts in preparing discovery indexes like Government Exhibit A or question the Government's willingness to answer or responsiveness to questions by Defendants.  Nevertheless, the haystacks remain.

Accordingly, "to facilitate preparation for trial, secure simplicity and fairness, and eliminate unjustifiable expense and delay," Defendants' motion is granted in part to the extent that, within 30 days from the date of this Order, the Government shall, to the best of its good-faith ability, identify from the materials disclosed those materials it does not intend to use at trial in *this case*.  *Contech*, 2021 WL 714991, at *5; *see McDade*, 1992 WL 382351, at *2; *see also* Fed. R. Crim. P. 2, 16.1(b).  To be clear, the Court is *not* telling the Government to reveal to the defense exactly what it intends to use at trial or ordering it to disclose its trial exhibits prior to any deadline set by the district court.

Defendants' motion is otherwise denied.  Notably, the Court has ordered early expert witness disclosures, *see supra* Section I, which will also "aid the Defendants in preparing for trial."  *Blankenship*, 2015 WL 4561458, at *7 (early Government expert disclosures "should also assist the Defendants in winnowing through discovery in preparation for trial").  Likewise, the parties have proposed to the district court early identification of witness and exhibit lists, which will further aid in narrowing down the issues and preparing for trial.  *See generally* ECF No. 295; ECF No. 296.

### B. Defendants' Joint Motion for Discovery, ECF No. 229, and Joint Motion for *Brady* Material, ECF No. 230, are GRANTED IN PART and DENIED IN PART.

In essence, Defendants request that the Government be ordered to search for and produce materials from "all federal and state agencies involved in the investigation that led to the Feeding Our Future indictments as well as other agencies, not directly involved, as to which the [G]overnment has knowledge of and access to case[-]related information."  ECF No. 239 at 3; *see also* ECF No. 239 at 3 (seeking the same for "material documents and objects").  Defendants seek materials from numerous federal and state agencies, including federal law enforcement investigating agencies: the Internal Revenue Service – Criminal Investigation ("IRS") and the United States Postal Inspection Service[6] ("USPIS"); other federal agencies: the Department of Justice's Covid 19 Fraud Enforcement Division[7] and the Department of Agriculture ("USDA"), including the Department's Food and Nutrition Service ("FNS"), as related to the Federal Child

---

[6] Referred to at times as United States Postal Service – Criminal Investigation.
[7] Referred to at times as Department of Justice – Fraud Enforcement Division.

Nutrition Program administered by the Department; and state agencies: Office of the Minnesota Attorney General ("Minnesota AG") and Minnesota Department of Education ("MDE").   Defendants' motions are brought pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E) as well as *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

In support of their motion, Defendants argue that these agencies, along with the Federal Bureau of Investigation ("FBI"), "were engaged in a joint effort that led to the Feeding Our Future indictments," citing press releases by the Minnesota AG and the Department of Justice as well as a press conference[8] regarding this and the related cases. ECF No. 239 at 6, 7; *see generally* Exs. 1 and 2 to Decl. of Frederick J. Goetz, ECF Nos. 232-1, 232-2; Defs. Ex. 1.   Defendants additionally argue that materials from the USDA and the FNS pertaining to the administration of the Federal Child Nutrition Program, including "standards for participation in the Federal Child Nutrition Program and waivers of th[o]se standards" as well as "documents defining what constitutes a 'meal,'" go to "the heart of the [G]overnment's allegations and [their] defenses thereto."   ECF No. 239 at 11.

The Government responds that the investigation into the alleged fraudulent scheme was conducted by the United States Attorney's Office for the District of

---

[8] While these motions were under advisement, the Court informed the parties that there were difficulties with certain YouTube links cited to by Defendants.  *See generally* ECF No. 314.  The Court directed defense counsel to ensure that all videos referred to in support of Defendants' arguments were submitted to the Court no later than December 15, and that these motions would be deemed under advisement as of that date.  *See generally* 314.  These videos were subsequently provided to the Court, and will be referred to as Defendants' Exhibits 1 and 2.

In e-mail correspondence with the Court, counsel for Mukhtar Mohamed Shariff confirmed that the press conference referred to in Paragraph 9 of the Declaration of Frederick J. Goetz, ECF No. 232, referenced at https://www.youtube.com/watch?v=FlG6m1wk1fA, was the same press conference referred to elsewhere as the "USAO-MN Announces Charges Against 47 Defendants in $250 Million Feeding Our Future Fraud Scheme," YouTube (Sept. 20, 2022) video, referenced at https://www.youtube.com/watch?v=lXBVWVnXJrg. *See, e.g.*, ECF No. 261 at 3, 13; ECF No. 278 at 43 n.3.  Defendants' Exhibit 1 contains the video of this press conference.

Minnesota along with agents from the FBI, IRS, and USPIS.  ECF No. 278 at 10; *see* Tr.

43:25-44:6 ("The fact of the matter is that the scope of the prosecution team for this

federal criminal investigation involved the United States Attorney's Office in conjunction

with federal criminal law enforcement partners, including the FBI, the U.S. Postal

Inspection Service, and criminal agents with the IRS."); *see also* Ex. 2 to Goetz Decl.,

ECF No. 232-2 at 8 ("United States Attorney Andrew Luger thanked the FBI, IRS

Criminal Investigation, and the U.S. Postal Inspection Service for their collaboration and

skilled investigative work in bringing these indictments.").  The Government states that

all materials from these law enforcement agencies have been produced to Defendants.[9]

      As to the other federal agencies, the Government maintains that "[t]he Department

of Justice's Covid-19 Fraud Enforcement Task Force was not involved in this

investigation," and only "participated in the press conference to raise awareness of the

Department of Justice's ongoing efforts to combat and prosecute[] Covid-19 fraud

schemes."  ECF No. 278 at 11.  With respect to the USDA and the FNS, the Government

likewise states they were not involved in the investigation.  ECF No. 278 at 13.  The

Government explains, as outlined in the Superseding Indictment, "the USDA provides

the federal funds that support the federal child nutrition programs" and the FNS is the

USDA agency "that administers . . . [those] programs."  ECF No. 278 at 14; *see* ECF No.

57 at 2.  The FNS "administers the programs at the national and regional levels by

---

[9] At the hearing, the Court sought clarification regarding the Government's "has been (or will be produced)" phrasing.  ECF No. 278 at 10; *see also* ECF No. 278 at 5 (Government has produced "essentially everything"); *see* Tr. 46:24-47:2.  The Government explained that "because . . . [this is] an ongoing matter, there is additional discovery that's coming in," and this language referred to any future supplementation as a result.  Tr. 47:3-22 ("And so that's, I think, why there's language indicating we've produced the items that we have, and to the extent there's additional evidence to be disclosed as we gather it, we will produce it.").  *See infra* n.10.

distributing federal funds to state governments." ECF No. 278 at 14 (quoting ECF No. 57 at 2). Noting that the "the USDA has an Office of Inspector General," the Government states that "it was not involved in this investigation in any way." ECF No. 278 at 14. The Government further states that "any documents that agents involved in the case obtained from the USDA or the [FNS] during the investigation have been produced in discovery." ECF No. 278 at 14.

Turning to the state agencies, some additional background is necessary. As noted above, the FNS distributes the federal funds to state governments. In Minnesota, MDE "administers the Federal Child Nutrition Program." ECF No. 57 at 2. "Meals funded by the Federal Child Nutrition Program in Minnesota are served at 'sites.' Each site participating in the Federal Child Nutrition Program must be sponsored by an organization that is authorized to participate in the Federal Child Nutrition Program." ECF No. 57 at 2-3. "Sponsors are required to submit an application to MDE for each site," and "[s]ponsors are responsible for monitoring each of their sites and preparing reimbursement claims for their sites." ECF No. 57 at 3. "Sponsors submit reimbursement claims to MDE on behalf of sites under their sponsorship. The USDA provides federal reimbursement funds to MDE on a per-meal basis. MDE provides the federal funds to the sponsoring agency, which in turn pays the reimbursement funds to the sites under its sponsorship," less an "administrative fee in exchange for sponsoring the sites, submitting reimbursement claims, and disbursing the federal funds." ECF No. 57 at 3. "Feeding Our Future was an approved sponsor of the Federal Child Nutrition Program." ECF No. 57 at 4.

As explained by the Government, in November 2020, Feeding Our Future sued MDE in state court "after [it] raised questions about the number of sites and amount of claims being submitted by Feeding Our Future and sites under its sponsorship and denied Feeding Our Future site applications." ECF No. 278 at 11; *see* ECF No. 1 at 10-11 in No. 22-cr-223. "In the lawsuit, Feeding Our Future accused MDE of denying the site applications due to racial animus in violation of the Minnesota Human Rights Act." ECF No. 278 at 11; *see* ECF No. 1 at 10-11 in No. 22-cr-223. MDE was represented by the Minnesota AG in the state action.

During the state litigation, "MDE and the [Minnesota AG] contacted the FBI about the potential fraud [allegedly being] carried out by Feeding Our Future and sites under its sponsorship." ECF No. 278 at 11; *see also* ECF No. 278 at 13 ("An MDE employee contacted the FBI in 2021 to report suspicions that sites under the sponsorship of Feeding Our Future were submitting fraudulent federal child nutrition program claims."). "In the wake of the referral, the FBI and the U.S. Attorney's Office opened a federal grand jury investigation." ECF No. 278 at 13. "During that investigation, the [G]overnment subpoenaed MDE for records related to the [alleged] fraud scheme." ECF No. 278 at 13. "The [G]overnment also interviewed several MDE employees during its investigation." ECF No. 278 at 13; *see also* ECF No. 278 at 15. The Government has produced to Defendants the subpoenaed MDE records as well as the reports of the interviews with MDE employees.

Like the other federal agencies, the Government similarly states that the Minnesota AG and MDE were "not involved in the criminal investigation" and "did not

criminally investigate potential fraud by Feeding Our Future and other entities involved in the Federal Child Nutrition Program."  ECF No. 278 at 11; *see also* ECF No. 278 at 13.  The Government states the Minnesota AG "represented MDE after it was sued by Feeding Our Future" and, along with MDE, "contacted the FBI about the potential fraud [allegedly being] carried out."  ECF No. 278 at 11.  The Government states that neither the Minnesota AG nor MDE were involved in conducting interviews or gathering evidence as part of the federal criminal investigation.  The Government also states that neither the Minnesota AG nor MDE had "access to, or knowledge of, the interview reports and other evidence obtained as part of the federal grand jury investigation that led to the charges filed."  ECF No. 278 at 12; *see* ECF No. 278 at 13, 15.

### 1.  Discovery in Criminal Matters

"Criminal defendants do not have a general constitutional right to discovery." *United States v. Johnson*, 228 F.3d 920, 924 (8th Cir. 2000); *see also, e.g.*, *United States v. Tavlin*, No. 22-cr-134 (DWF/JFD), 2023 WL 3477610, at *3 (D. Minn. May 16, 2023). "In most circumstances, then, a defendant must point to a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government."  *Johnson*, 228 F.3d at 924; *accord Tavlin*, 2023 WL 3477610, at *3.

Generally speaking, "[i]n criminal cases, the prosecution's 'discovery obligation is rooted in two separate sources:' Rule 16 and the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution."  *United States v. Ivers*, No. 22-cr-00341 (RWP/HCA), 2023 WL 2182327, at *2 (D. Minn. Feb. 23, 2023) (quoting *United States v. W.R. Grace*, 401 F. Supp. 2d 1069, 1073-74 (D. Mont. 2005)).  Under Federal

21

Rule of Criminal Procedure 16(a)(1), the Government is required "to disclose, among other things, and upon the defendant's request, a defendant's oral, written, or recorded statement; and documents and objects within [its] possession, custody, or control that are material to the defense, intended to be used in the government's case-in-chief, or from the defendant." *Tavlin*, 2023 WL 3477610, at *3 (citing Fed. R. Crim. P. 16(a)(1)(A), (B), (E)). "The Eighth Circuit defines 'material' information for purposes of Rule 16 as information that is 'helpful to the defense.'" *United States v. Hoeffener*, No. 4:16CR00374 JAR/PLC, 2017 WL 3676141, at *11 (E.D. Mo. Aug. 25, 2017) (quoting *United States v. Vue*, 13 F.3d 1206, 1208 (8th Cir. 1994)); *see also, e.g.*, *United States v. Red Bird*, No. 3:20-30026-RAL, 2020 WL 6129634, at *5 (D. S.D. Oct. 19, 2020). "A showing of materiality, however, is not satisfied by a mere conclusory allegation that the requested information is material to the preparation of the defense." *United States v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985) (quotation omitted); *accord Red Bird*, 2020 WL 6129634, at *5; *Hoeffener*, 2017 WL 3676141, at *11; *cf. Ivers*, 2023 WL 2182327, at *2 ("defendant must make a threshold showing of materiality" (quotation omitted)).

As the Court previously stated in its Order on Pretrial Disclosure & Preservation, "[t]he Due Process Clause of the Fifth Amendment requires the government to disclose to the accused favorable evidence that is material to guilt or punishment." *United States v. Dones-Vargas*, 936 F.3d 720, 722 (8th Cir. 2019) (citing *Brady*, 373 U.S. at 87); *see also* Fed. R. Crim. P. 5(f). "Under *Brady* and its progeny, prosecutors have a duty to disclose to the defense all material evidence favorable to the accused, including impeachment and exculpatory evidence." *United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016);

*accord United States v. Wright*, 866 F.3d 899, 908 (8th Cir. 2017); *see United States v. Whitehill*, 532 F.3d 746, 753 (8th Cir. 2008) ("*Brady* applies to exculpatory and impeachment evidence, whether or not the accused has specifically requested the information." (citations omitted)); *see also Tavlin*, 2023 WL 3477610, at *3. "The [Supreme] Court has extended *Brady* protection to witness-credibility evidence when the reliability of the witness 'may well be determinative of guilt or innocence.'" *United States v. Sigillito*, 759 F.3d 913, 930 (8th Cir. 2014) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *accord Dones-Vargas*, 936 F.3d at 722; *see United States v. Primm*, 63 F.4th 1186, 1192 (8th Cir. 2023); *Tavlin*, 2023 WL 3477610, at *3. "One reason for this extension to witness-credibility evidence is because exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Sigillito*, 759 F.3d at 930 (quotation omitted). The Eighth Circuit "ha[s] determined that witness motivations, like the payment of money as an incentive to change testimony, fall within the *Brady* disclosure requirement." *Id.* (citing *United States v. Librach*, 520 F.2d 550, 554 (8th Cir. 1975)). "Furthermore, the prosecutor must disclose the possibility of a reward that gives the witness a personal stake in the defendant's conviction." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 683 (1985)).

The "prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including [law enforcement]." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *accord Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see Wright*, 866 F.3d at 908; *Robinson*, 809 F.3d at 996; *United States v. Tyndall*, 521

F.3d 877, 882 (8th Cir. 2008).   As the Government itself acknowledges, "[t]his requirement extends not only to materials possessed by the prosecution but also to materials possessed by agents and agencies involved in its investigation."  ECF No. 278 at 8.  "This attendant duty to learn of material and favorable exculpatory or impeachment evidence necessarily anticipates that a prosecutor will have an opportunity to discover such evidence through the exercise of reasonable diligence." *Robinson*, 809 F.3d at 996.

### 2.  Whether There Exists a Joint Investigation

The question here, argued by Defendants in tandem with respect to both motions, is the scope of the prosecution team and whether there has been a joint investigation between federal law enforcement (the United States Attorney's Office for the District of Minnesota/Government, FBI, IRS, and USPIS) and the other federal and state agencies. "Whether the prosecution has a duty to conduct a *Brady* review of materials in the possession of another government agency depends on a fact-intensive inquiry into the extent to which the agencies conducted a joint investigation."   *United States v. Gilbertson*, No. 17-cr-0066(1) (PJS/HB), 2018 WL 1905805, at *2 (D. Minn. Apr. 23, 2018); *accord Tavlin*, 2023 WL 3477610, at *3; *see, e.g.*, *United States v. Middendorf*, No. 18-CR-36 (JPO), 2018 WL 3956494, at *4 (S.D. N.Y. Aug. 17, 2018); *United States v. Connolly*, No. 1:16-cr-00370 (CM), 2017 WL 945934, at *6, 7 (S.D. N.Y. Mar. 2, 2017); *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D. N.Y. 2012); *see also, e.g.*, *United States v. Tournant*, No. 22-CR-276-LTS, 2023 WL 5001186, at *3 (S.D. N.Y. Aug. 4, 2023); *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *5 (S.D. N.Y. Jan. 26, 2023); *United States v. Avenatti*, No. 19-CR-374 (JMF), 2022 WL

457315, at *10 (S.D. N.Y. Feb. 15, 2022); *United States v. Bases*, 549 F. Supp. 3d 822, 825 (N.D. Ill. 2021); *United States v. Bourassa*, No. 4:18-cr-3-MLB, 2020 WL 7778038, at *2 (N.D. Ga. Dec. 31, 2020); *United States v. Tyson*, No. 1:18CR708, 2020 WL 255533, at *1 (N.D. Ohio Jan. 16, 2020); *United States v. Ferguson*, 478 F. Supp. 2d 220, 238 (D. Conn. 2007); *cf. United States v. Risha*, 445 F.3d 298, 301-02 (3d Cir. 2006); *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979); *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D. N.Y. 2018).

"To determine whether a joint investigation has occurred, courts engage in a case-by-case analysis of the extent of interaction and cooperation between the . . . governmental agencies." *Tavlin*, 2023 WL 3477610, at *3 (quotation omitted); *see Antone*, 603 F.2d at 570; *Bases*, 549 F. Supp. 3d at 826. "A primary factor is the nature of cooperation, such as coordinating witness interviews and investigating the facts of the case." *Tavlin*, 2023 WL 3477610, at *3; *see Bases*, 549 F. Supp. 3d at 826; *Middendorf*, 2018 WL 3956494, at *4. Other factors include

> whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings.

*Middendorf*, 2018 WL 3956494, at *4; *accord Tavlin*, 2023 WL 3477610, at *3; *see also, e.g.*, *Risha*, 445 F.3d at 304 (questions to consider include "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are

participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence").

"The mere fact the Government may have requested and received documents from another agency in the course of its investigation does not convert the investigation into a joint one." *Ferguson*, 478 F. Supp. 2d at 239 (quotation omitted); *see, e.g.*, *United States v. Blondet*, No. 16-cr-387 (JMF), 2022 WL 549707, at *1 (S.D. N.Y. Feb. 23, 2022) ("[T]he mere fact that a government entity responds to targeted document requests does not, without more, make that entity part of the prosecution team."); *see also, e.g.*, *Tournant*, 2023 WL 5001186, at *8; *Tavlin*, 2023 WL 3477610, at *4; *Alexandre*, 2023 WL 416405, at *7; *Bourassa*, 2020 WL 7778038, at *3; *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D. N.Y. 2006). "Instead, the key to the analysis is the level of involvement between the United States Attorney's Office and the other agencies." *Ferguson*, 478 F. Supp. 2d at 239 (quotation omitted); *see Bourassa*, 2020 WL 7778038, at *2 ("courts ask whether the state officials essentially functioned as agents of the federal government under the principles of agency law" (quotation omitted)).

### 3.  No Joint Investigation

Defendants rely on comments made in press releases and during a press conference to show that there was a joint investigation between federal law enforcement (the United States Attorney's Office for the District of Minnesota/Government, FBI, IRS, and USPIS) and the other federal and state agencies.

On September 20, 2022, the Department of Justice issued a press release and the United States Attorney for the District of Minnesota ("U.S. Attorney") held a press

conference announcing the charges in this and five other related cases. *See* Goetz Decl.

¶¶ 7-12, ECF No. 232; *see generally* Ex. 2 to Goetz Decl., ECF No. 232-2; Defs. Ex. 1.

In the Department of Justice's press release, the United States Attorney General is quoted

as saying: "In partnership with agencies across government, the Justice Department will

continue to bring justice to those who have exploited the pandemic for personal gain and

stolen from American taxpayers." Ex. 2 to Goetz Decl., ECF No. 232-2 at 1. The press

release also includes comments from the FBI and the IRS referring to "law enforcement

partners." Ex. 2 to Goetz Decl., ECF No. 232-2 at 1, 3. The press release states that the

U.S. Attorney "thanked the FBI, [IRS], and [USPIS] for their collaboration and skilled

investigative work in bringing these indictments." Ex. 2 to Goetz Decl., ECF No. 232-2

at 8.

    In attendance at the press conference alongside the U.S. Attorney were the agents

in charge for the FBI, IRS, and USPIS as well as the Associate Deputy Attorney General

and Director of Covid 19 Fraud Enforcement for the Department of Justice ("Covid 19

Fraud Director"). Defs. Ex. 1 at 00:55-1:25. During the press conference, the U.S.

Attorney thanked the FBI, IRS, USPIS, and the Assistant United States Attorneys in the

office for their work in investigating this matter. Defs. Ex. 1 at 26:04-27:50. The U.S.

Attorney also thanked the Covid 19 Fraud Director for "traveling to Minnesota for this

announcement." Defs. Ex. 1 at 27:50-28:02. Additionally, the U.S. Attorney thanked the

"people who have come forward to tell us how this scheme worked." Defs. Ex. 1 at

28:03-10; *see* Defs. Ex. 1 at 28:10-28:21.

Among others, the FBI thanked MDE "for their cooperation and their continued transparency throughout the investigation." Defs. Ex. 1 at 28:42-29:06. The FBI discussed its investigative work, *see* Defs. Ex. 1 at 29:57-30:56, including with its IRS and USPIS law enforcement partners, *see* Defs. Ex. 1 at 30:57-31:36; *see also* Defs. Ex. 1 at 32:56-33:28. The IRS was "happy to join with [its] partners" and thanked the United States Attorney's Office for the District of Minnesota, FBI, and USPIS for "their partnership in this investigation." Defs. Ex. 1 at 34:41-53. The USPIS was "proud to be standing here with [its] federal partners," naming the FBI, IRS, and the United States Attorney's Office for the District of Minnesota. Defs. Ex. 1 at 35:13-21; *see* Defs. Ex. at 36:26-37:03.

The Covid 19 Fraud Director thanked the U.S. Attorney "for the invitation to join in this important announcement." Defs. Ex. 1 at 37:14-20. The Covid 19 Fraud Director also thanked the individuals involved in investigating and prosecuting this matter, specifically naming the FBI, IRS, and USPIS. Defs. Ex. 1 at 37:27-39. The Covid 19 Fraud Director then spoke generally about the work of the Department of Justice's Covid 19 Fraud Enforcement Division and broadly about the allegations in these related cases. *See* Defs. Ex. 1 at 37:39-40:05, 45:27-45:51.

In answering questions, the U.S. Attorney discussed how concerns were raised by MDE, who ultimately brought those concerns to the FBI. Defs. Ex. 1 at 40:46-41:19. The U.S. Attorney stated that he was pleased with "the cooperation, thorough cooperation we got from MDE throughout this investigation." Defs. Ex. 1 at 42:04-19.

The Minnesota AG issued a press release a few days later. *See generally* Ex. 1 to Goetz Decl., ECF No. 232-1. In this press release, the Minnesota AG stated that "[w]ithout [its] involvement alongside MDE in flagging the fraud and turning it over to the criminal investigative power of the federal government, there would likely have been no federal investigation or indictments." Ex. 1 to Goetz Decl., ECF No. 232-1 at 1. The Minnesota AG additionally stated that "[e]arly on, [it] worked side by side with MDE to flag evidence of fraud, demand correction from Feeding Our Future, defend MDE from Feeding Our Future's scurrilous lawsuit – and most importantly, bring evidence of criminal fraud to the FBI, which led directly to the federal criminal investigation and criminal indictments of Feeding Our Future for fraud." Ex. 1 to Goetz Decl., ECF No. 232-1 at 1. The Minnesota AG stated that "MDE and [the Minnesota AG] brought their suspicions of fraud to the FBI and fully cooperated with the investigation that they jump-started," noting, among other things, that "the federal government has criminal jurisdiction over fraud involving federal programs, which neither MDE nor the [Minnesota AG] have." Ex. 1 to Goetz Decl., ECF No. 232-1 at 1; *see also* Ex. 1 to Goetz Decl., ECF No. 232-1 at 2 ("In the spring of 2021, MDE contacted the FBI with its concerns that Feeding Our Future was committing criminal fraud, and the FBI began to investigate."), 3 ("The suspicions of fraud that MDE and the [Minnesota AG] presented to the FBI was the trigger for the FBI's criminal investigation . . . ."). The Minnesota AG additionally stated that the indictments were "a direct result of the choice the [Minnesota AG] and MDE made . . . to turn their concerns over to the federal government and to cooperate fully with them." Ex. 1 to Goetz Decl., ECF No. 232-1 at 1. The Minnesota

AG noted that its representatives "met confidentially with the FBI on a regular basis to cooperate fully with the investigation." Ex. 1 to Goetz Decl., ECF No. 232-1 at 2. The Minnesota AG stated that it "was by MDE's side supporting and representing the agency throughout the federal investigation." Ex. 1 to Goetz Decl., ECF No. 232-1.

Courts have found "generalized statements of partnerships—and the related expressions of gratitude—" to be insufficient to show that other agencies were part of a joint investigation." *Bourassa*, 2020 WL 7778038, at *4; *see Alexandre*, 2023 WL 416405, at *7 ("Nor is the fact that the U.S. Attorney's Office and the [Commodity Futures Trading Commission] thanked each other in their press releases a basis for finding a joint investigation."); *see also Connolly*, 2017 WL 945934, at *8 (expression of appreciation alone not enough). "[T]he fact that the agencies 'support[ed]' the investigation could mean almost anything." *Blondet*, 2022 WL 549707, at *1 (alteration in original); *see Tournant*, 2023 WL 5001186, at *7 ("The fact of a joint press conference or press release is no more indicative of a joint investigation than it is of cooperation between parallel investigations."). Further, such statements are made "in a quasi-political setting in which [the agencies] had strong incentives to maximize public perception of their unity, cooperation, and involvement in the case." *Bourassa*, 2020 WL 7778038, at *4. "Given the general nature of the statements and the 'press' context in which they were made, [such statements] say little about who was (*as a legal matter*) part of the federal prosecution team . . . ." *Id.* (emphasis added) (footnote omitted). Notably, both press releases as well as the press conference referred to federal law enforcement (the United States Attorney's Office for the District of Minnesota/Government, FBI, IRS, and

USPIS) as the investigator in connection with this prosecution, not the other federal and state agencies.

As stated above, the fact that the state and federal agencies provided documents to federal law enforcement does not render the federal prosecution a joint investigation or per se demonstrate that joint fact gathering occurred. This is particularly true considering those documents produced by the state agencies were pursuant to grand jury subpoenas. *See United States v. Velissaris*, No. 22cr105 (DLC), 2022 WL 2392360, at *3 (S.D. N.Y. July 3, 2022) ("To the extent the USAO has relied on evidence gathered from the SEC, that evidence was gathered before the USAO began its own investigation, and was not performed under its direction."); *Blondet*, 2022 WL 549707, at *1; *Ferguson*, 478 F. Supp. 2d at 239. And, it bears repeating that all documents provided by the federal and state agencies have been produced to Defendants.[10] *See Tavlin*, 2023 WL 4669558, at *4 & n.6. Moreover, the Government did not "provid[e] the[] materials [obtained via the grand jury subpoenas] to (or even discuss[] them with) MDE, the Minnesota [AG], or the other [federal] entities identified by [D]efendants." ECF No. 278 at 15; *see* ECF No. 278 at 1. *See Alexandre*, 2023 WL 416405, at *6 (noting "information sharing largely flowed only in one direction," and "with a few limited exceptions," other agencies "did not review documents gathered only by the prosecution" (quotation omitted)); *see also Middendorf*, 2018 WL 3956494, at *5.

---

[10] To the extent additional material subsequently comes into the Government's possession, custody, or control, such material shall be produced in a timely fashion.

There is no indication that there were joint interviews.  *See Middendorf*, 2018 WL 3956494, at *5; *Connolly*, 2017 WL 945934, at *7.  *Contra Gupta*, 848 F. Supp. 2d at 494 (joint interviews of "no fewer than 44 witnesses").   As represented by the Government, "[n]o representative from MDE, the Minnesota [AG], USDA, FNS, or the other entities were present for any of the[] interviews," and, with the exception of MDE employees who were *being interviewed*, the "interviews were conducted without these entities' presence, involvement, or even knowledge."  ECF No. 278 at 15.

Nor is there any claim by Defendants, who have access to the grand jury materials, that the other federal and state agencies were involved in presenting the federal prosecution to the grand jury.  *See Tavlin*, 2023 WL 3477610, at *4; *Middendorf*, 2018 WL 3956494, at *5.

Based on the foregoing, the Court finds that any touted "partnership" and "cooperation" in the press does not, in this case, establish that the other federal and state agencies were involved in joint fact-gathering and there was no joint investigation between and among federal law enforcement (the United States Attorney's Office for the District of Minnesota/Government, FBI, IRS, and USPIS) and the other federal and state agencies.

Accordingly, Defendants' motions are granted in part in so far as the Government shall—to the extent it has not done so already and in the future as may be developed in the course of its ongoing investigation—comply fully with its obligations under *Brady*, *Giglio*, and their progeny and disclose all exculpatory and impeachment evidence as well as Jencks Act, 18 U.S.C. § 3500, Federal Rule of Criminal Procedure 26.2, and Federal

Rule of Criminal Procedure 16 materials.  *Cf. United States v. Mazzulla*, 932 F.3d 1091, 1100 (8th Cir. 2019).  As there was no joint investigation, Defendants' motions are otherwise denied as to materials requested that are solely within the possession of the other federal and state agencies.

### C. Defendants' Motion to Disclose and Make Informant Available for Interview, ECF No. 233, and Abdiwahab Maalim Aftin's Motion for Disclosure of Confidential Informant, ECF No. 246, are GRANTED IN PART and DENIED IN PART.

Defendants "request disclosure of the identity of . . . [any informants utilized by the Government in the investigation of this matter], an opportunity to interview them, and disclosure of their past criminal record and evidence of any other reasons for informing in the instant matter."  ECF No. 234 at 2; *see also generally* ECF No. 246.  Defendants further request that any order be in the form of an "ongoing obligation" as the Government's investigation continues.  ECF No. 234 at 2.  In its response, the Government states that it "did not utilize any confidential informants or cooperating witnesses whose identities are unknown to [Defendants] as contemplated by *Roviaro v. United States*, 353 U.S. 53, 59 (1957)."  ECF No. 278 at 16.

At the hearing, the Government reiterated that it "did not utilize any confidential informants."  Tr. 57:15-16.  Defendants also acknowledged that the Government had identified cooperating witnesses within the scope of *Roviaro*.  Tr. 55:12-20, 56:10-12.  Defendants explained that they were interested in information pertaining not only to those cooperating witnesses the Government intended to call at trial, but all cooperating witnesses.  Tr. 56:16-21.  Defendants also stated there was a lack of clarity regarding "the

specifics of cooperation and cooperation incentives" in the Government's disclosures. Tr. 56:22-25; *see* Tr. 57:6-7 ("[T]he specifics of the incentives are things that have not been identified or described."). The Government confirmed its willingness to "confer with counsel if there are questions they want to discuss." Tr. 57:20-21.

"In *Roviaro v. United States*, the Supreme Court recognized the government's privilege to withhold the identity of a confidential informant." *United States v. Alcantar*, 271 F.3d 731, 739 (8th Cir. 2001) (citing 353 U.S. at 59). In determining whether disclosure of an informant's identity is required, "the threshold issue is whether the informant is a material witness." *Carpenter v. Lock*, 257 F.3d 775, 779 (8th Cir. 2001); *see United States v. Barnes*, 486 F.2d 776, 778 (8th Cir. 1973) ("Certainly one of the most relevant factors to be weighed by the court is whether or not the evidence is *material* to the accused's defense or a fair determination of the case." (footnote omitted)).

"Where the witness is an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense." *Devose v. Norris*, 53 F.3d 201, 206 (8th Cir. 1995) (emphasis added) (footnote omitted); *see also Barnes*, 486 F.2d at 778-79. "In cases involving 'tipsters' who merely convey information to the government but neither witness nor participate in the offense, disclosure is generally not material to the outcome of the case and is therefore not required." *United States v. Harrington*, 951 F.2d 876, 878 (8th Cir. 1991) (citing *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987)); *accord United States v. Lapsley*, 334 F.3d 762, 764 (8th Cir. 2003) ("Consequently, disclosure is typically not required when the informant merely conveys information to the government but neither witnesses nor participates in the

34

offense." (quotations omitted)); *Alcantar*, 271 F.3d at 739 (government had no obligation to reveal informant's identity where informant did not participate in crime charged or testify at trial).

Defendants bear the burden of showing beyond mere speculation that disclosure will be material and helpful to their case. *United States v. Roberson*, 439 F.3d 934, 940 (8th Cir. 2006); *Alcantar*, 271 F.3d at 739. "If a trial court orders disclosure absent a showing of materiality, it abuses its discretion." *United States v. Bias*, No. 17-cr-318(06) (SRN/FLN), 2018 WL 3336770, at *2 (D. Minn. July 6, 2018).

Defendants' motions are granted in part to the extent that the Government shall— to the extent it has not done so already and in the future as may be developed in the course of its ongoing investigation—identify any informants and cooperating individuals who "were percipient witnesses to the crimes" charged, "will be witnesses at . . . trial," or "whose testimony will be material to the determination of the case against [Defendants]." *Bias*, 2018 WL 3336770, at *2. Defendants' motions are further granted in part to the extent that the Government shall comply fully with its obligations under *Brady*, *Giglio*, and their progeny with respect to such individuals. To the extent questions remain regarding certain aspects of the Government's prior disclosures, the Court expects the Government to honor its pledge to work with defense counsel to address those questions. To the extent Defendants seeks discovery and disclosures outside the Government's obligations regarding such individuals, their motions are denied.

As for Defendants' request that the Government make these individuals available for an interview, the Eighth Circuit "has applied *Roviaro* to impose a duty on the

government to make every reasonable effort to have an informant shown to be a material witness made available to the defendant to interview or use as a witness." *United States v. Padilla*, 869 F.2d 372, 376 (8th Cir. 1989) (quotation omitted); *see Barnes*, 486 F.2d at 779-80; *see also United States v. Sanchez*, 429 F.3d 753, 756 (8th Cir. 2005); *Devose*, 53 F.3d at 206; *Bias*, 2018 WL 3336770, at *3. "[T]he Government's disclosure obligation with respect to confidential informants is generally satisfied when it provides a defendant with information pertaining to an informant's identity and location so that the defendant may contact the informant and request an interview or subpoena his or her testimony at trial." *United States v. Abari*, No. 19-cr-103 (MJD/ECW), 2020 WL 1983732, at *5 (D. Minn. Apr. 27, 2020) (citing *Padilla*, 869 F.2d at 376-77); *see Sanchez*, 429 F.3d at 756. "If the Government has particular concerns about protecting these individual[s] or is aware that the Defendants may encounter difficulty in locating . . . [these individuals], then it should produce [them] to Defendants to interview in lieu of providing . . . [their] address[es] to Defendants." *Abari*, 2020 WL 1983732, at *5. Regardless of the means of production, such individuals "always have the right to decline to be interviewed and the Government has no obligation to 'encourage' . . . [them] to speak to Defendants." *Id.* (citing *United States v. Bittner*, 728 F.2d 1038, 1041-42 (8th Cir. 1984)).

To the extent Defendants seek identification of and information regarding any other informants or cooperating individuals, including non-testifying individuals not otherwise encompassed within the Government's disclosure obligations, their motions are further denied as they have failed to meet their burden of demonstrating the need for

disclosure of these individuals.  *See Alcantar*, 271 F.3d at 739; *United States v. Hollis*, 245 F.3d 671, 674 (8th Cir. 2001).

## III. INDIVIDUAL MOTIONS

The Court now turns to the motions to sever Defendants from one another, to sever counts, and for a bill of particulars filed by certain Defendants individually.

**A. Abdiaziz Shafii Farah's Motion to Sever Defendants, ECF No. 243, Mohamed Jama Ismail's Motion to Sever Defendants and to Sever Counts,[11] ECF No. 253, Mahad Ibrahim's Motion for Severance of Defendants, ECF No. 257, Said Shafii Farah's Motion for Severance,[12] ECF No. 259, Abdiwahab Maalim Aftin's Motion for Severance of Counts and Defendants,[13] ECF No. 245, and Mukhtar Mohamed Shariff's Motion for Severance of Defendants and Counts,[14] ECF No. 248, are DENIED WITHOUT PREJUDICE.**

Abdiaziz Shafii Farah, Mohamed Jama Ismail, Mahad Ibrahim, Said Shafii Farah, Abdiwahab Maalim Aftin, and Mukhtar Mohamed Shariff have each moved to sever his trial from that of his co-defendants.  Defendants assert that they will be prejudiced by a joint trial because the jury will be unable to compartmentalize the evidence against each defendant given the scope and complexity of the charges in this case.  Defendants also raise concerns over the potential for use by the Government of a co-defendant's statement and *Bruton*[15] issues.  The Government responds that Defendants have all been charged with participating in the same alleged fraudulent scheme and conspiracy and concerns

---

[11] The Court addresses Mohamed Jama Ismail's request to sever counts by separate motion, ECF No. 252, below. *See infra* Section III.B.

[12] The Court addresses Said Shafii Farah's request to sever counts by separate motion, ECF No. 263, below. *See infra* Section III.B.

[13] Although titled as a motion to sever both counts and his trial from that of his co-defendants, Abdiwahab Maalim Aftin's motion is limited to seeking severance of trial. *See generally* ECF No. 245.

[14] Mukhtar Mohamed Shariff's motion is a combined motion requesting both severance of his trial from his co-defendants and severance of certain counts. *See generally* ECF No. 248.  The Court addresses his request for the severance of certain counts below. *See infra* Section III.B.

[15] *Bruton v. United States*, 391 U.S. 123 (1968).

over the jury's ability to compartmentalize the evidence are best addressed through the district court's jury instructions.  The Government further responds that it "is not aware of any . . . [extrajudicial] statement [of one defendant implicating another defendant]," and Defendants "collectively do not point to any particular statement" implicating their rights under *Bruton*.  ECF No. 278 at 52.

"When a defendant moves for a severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8.  If joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14."  *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995).  The Federal Rules of Criminal Procedure are "liberally construed in favor of joinder" and joinder of defendants in the federal system commonly occurs.  *See United States v. Rimell*, 21 F.3d 281, 288 (8th Cir. 1994); *Darden*, 70 F.3d at 1526; *see also United States v. Thao*, No. 21-cr-108 (2-4) (PAM/TNL), 2021 WL 5564557, at *2, 7 (D. Minn. Nov. 29, 2021).

"The general rule is that persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts."  *United States v. Campbell*, 986 F.3d 782, 802 (8th Cir. 2021) (quotation omitted); *see, e.g.*, *United States v. Sherman*, 81 F.4th 800, 805 (8th Cir. 2023); *United States v. Gravatt*, 280 F.3d 1189, 1191 (8th Cir. 2002); *United States v. Voss*, 787 F.2d 393, 401 (8th Cir. 1986); *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996).  As Defendants themselves acknowledge, the Eighth Circuit has gone so far as to say: "We have said many times that it will be the rare case, if ever, where a

district court should sever the trial of alleged coconspirators." *United States v. Frazier*, 280 F.3d 835, 844 (8th Cir. 2002); *see, e.g.*, *Sherman*, 81 F.4th at 806; *United States v. Spotted Elk*, 548 F.3d 641, 658 (8th Cir. 2008).   Additionally, "[t]rying codefendants together not only conserves scarce time and resources, but also 'gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.'" *United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) (quoting *Darden*, 70 F.3d at 1528).

Pursuant to Rule 8, an indictment

> may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.   The defendants may be charged in one or more counts together or separately.   All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).   In requesting severance, Defendants have not argued they were improperly joined.[16]   Indeed, Defendants are all charged with having conspired with one another to commit wire fraud based on an alleged scheme "to obtain millions of dollars in Federal Child Nutrition Program funds by causing the submission of fraudulent information, including falsified invoices and meal count records with substantially inflated figures."   ECF No. 57 at 10; *see* ECF No. 57 at 10-29 (describing object and purpose, manner and means, and acts in furtherance of the alleged conspiracy).

Although Rule 8 permits joinder, "a trial court may order separate trials on different counts, or sever certain defendants' cases from others', to protect defendants'

---

[16] With the exception of Count 43 charging Abdiaziz Shafii Farah with making a false statement in a passport application, as discussed below.  *See infra* Section III.B.1.

fair-trial rights." *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996) (citing Fed. R. Crim. P. 14(a); *Darden*, 70 F.3d at 1527). Severance is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Where multiple defendants have been charged in the same indictment, "there is a preference for a joint trial unless the benefits are outweighed by a clear likelihood of prejudice." *Hively*, 437 F.3d at 765 (citing *Zafiro* 506 U.S. at 537 ); *see, e.g.*, *United States v. McCarther*, 596 F.3d 438, 442 (8th Cir. 2010) ("[T]here is a strong presumption against severing properly joined counts."); *see also, e.g.*, *Thao*, 2021 WL 5564557, at *3. "[T]here is no requirement in a joint trial that the quantum of evidence of each defendant's culpability be equal." *United States v. Flores*, 362 F.3d 1030, 1042 (8th Cir. 2004) (quotation omitted). Moreover, "disparity among the defendants in extent of involvement and culpability is commonplace in conspiracy cases and does not alone show the kind of prejudice that would require a district court to sever, rather than to respond with some less drastic measure such as a curative instruction." *Spotted Elk*, 548 F.3d at 658; *accord United States v. May*, 70 F.4th 1064, 1071 (8th Cir. 2023).

"Consequently, [Defendants] carr[y] a heavy burden in demonstrating that severance is mandated." *United States v. Young*, 753 F.3d 757, 777 (8th Cir. 2014). A defendant seeking severance must show that a joint trial would cause "real prejudice." *United States v. Mickelson*, 378 F.3d 810, 817-18 (8th Cir. 2004); *see United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003) ("necessary prejudice must be severe or

compelling" (quotation omitted)).  This is "something more than the mere fact that [a defendant] would have had a better chance for acquittal had he been tried separately." *Mickelson*, 378 F.3d at 818 (quotation omitted); *see also Hively*, 437 F.3d at 765 ("Severance is never warranted simply because the evidence against one defendant is more damaging than against another.").

 "A defendant seeking severance can demonstrate prejudice to his right to a fair trial by showing . . . that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants."[17]  *May*, 70 F.4th at 1071 (quotation omitted); *see, e.g.*, *Anderson*, 783 F.3d at 743; *Lewis*, 557 F.3d at 609; *Mickelson*, 378 F.3d at 818. "Prejudice can be demonstrated by showing that the jury will be unable to compartmentalize the evidence as it relates to the separate defendants because of a 'prejudicial spillover effect.'"  *Hively*, 437 F.3d at 765 (quoting *Mickelson*, 378 F.3d at 817).  This requires a defendant to make "a specific showing that a jury could not reasonably be expected to compartmentalize the evidence." *Id.*  (citations omitted); *see United States v. Sotelo-Valdovinos*, No. 14-cr-289 (11) (SRN/JSM), 2015 WL 2454048, at *4 (D. Minn. May 22, 2015) ("[A] defendant seeking severance has the heavy burden of demonstrating that a joint trial will impermissibly infringe his right to a fair trial.")

---

[17] "A defendant seeking severance can [also] demonstrate prejudice to his right to a fair trial by showing that his defense is irreconcilable with that of his co-defendant . . . ." *May*, 70 F.4th at 1071 (quotation omitted); *see, e.g.*, *United States v. Anderson*, 783 F.3d 727, 743 (8th Cir. 2015); *United States v. Lewis*, 557 F.3d 601, 610 (8th Cir. 2009); *Mickelson*, 378 F.3d at 818.  "[T]he existence of antagonistic defenses does not require severance unless the defenses are actually irreconcilable." *Lewis*, 557 F.3d at 609-10 (quotation omitted).  "A defense is irreconcilable when the jury, to believe the core of one defense, must necessarily disbelieve the core of another." *Id.* (quotation omitted); *accord Anderson*, 783 F.3d at 743.  "Antagonistic defenses require severance only when there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Lewis*, 557 F.3d at 610 (quotation omitted); *accord Anderson*, 783 F.3d at 743.  Abdiaziz Shafii Farah asserts "[i]t will be likely that the defenses are irreconcilable." ECF No. 244 at 6.  There is nothing before the Court indicating in what way Abdiaziz Shafii Farah's defenses may be antagonistic to that of his co-defendants, let alone any articulation of the way(s) in which any such defenses are irreconcilable such that his trial must be severed.

(internal quotation omitted); *see also, e.g.*, *United States v. Chen*, No. 21-cr-250 (JRT/TNL), 2023 WL 2424269, at *4 (D. Minn. Mar. 9, 2023); *Thao*, 2021 WL 5564557, at *5.

Finally, the Court must further balance "the inconvenience and expense of separate trials against the prejudice resulting from a joint trial." *Pherigo*, 327 F.3d at 693; *see also Hively*, 437 F.3d at 765 (where multiple defendants have been charged in the same indictment, "there is a preference for a joint trial unless the benefits are outweighed by a clear likelihood of prejudice"). "Only in an unusual case will any prejudice resulting from the ability of a jury to separate evidence be substantial enough to outweigh the general efficiency of joinder." *United States v. Martin*, 777 F.3d 984, 995 (8th Cir. 2015) (quotation omitted). "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *Zafiro*, 506 U.S. at 541.

### 1. Compartmentalization of the Evidence

It cannot be denied that this case is complex. *See supra* Section II.A. There are 8 defendants and over 40 counts. *See generally* ECF No. 57. Defendants' contention that a combined jury trial may well be unwieldy is far from hyperbole. But, Defendants must make "a *specific* showing" to warrant severance. *Hively*, 437 F.3d at 765 (emphasis added). While Defendants generally point to the number of charges in this case and the voluminous discovery produced *overall* in connection with this case *and the related cases*, they have not shown, with any sort of specificity, that a jury could not reasonably be expected to compartmentalize the evidence against them in *this case*. At this stage of

the proceedings and based on the record before this Court, Defendants have only speculated.

Nor is the Court persuaded by Mahad Ibrahim and Abdiwahab Maalim Aftin's arguments regarding their particular charges compared to the charges of their co-defendants.  As stated above, such disparity in conspiracy cases is common, *see May*, 70 F.4th at 1071; *Spotted Elk*, 548 F.3d at 658, and Mahad Ibrahim and Abdiwahab Maalim Aftin have not shown that "adequate jury instructions and admonitions by the trial judge would be [in]sufficient in this case to assist the jury's ability to compartmentalize the evidence and prevent prejudice," *Chen*, 2023 WL 2424269, at *4; *see Martin*, 777 F.3d at 995-96 ("careful and thorough" jury instructions "addressed any risk of prejudice created by the complexity of the case" (quotation omitted)).  Further, the federal-programs-bribery counts are "factually interrelated" to the overall alleged conspiracy and scheme to obtain millions of dollars in Federal Child Nutrition Program funds.  *United States v. Mueller*, 661 F.3d 338, 348 (8th Cir. 2011).  *See also infra* Section III.B.2.

### 2. *Bruton* Concerns

As for Defendants' *Bruton* concerns, *Bruton* held that the admission of an incriminating statement by a non-testifying co-defendant at a joint trial violates the defendant's rights under the Confrontation Clause.  391 U.S. at 137; *United States v. Singh*, 494 F.3d 653, 658 (8th Cir. 2007).  "*Bruton*, however, does not preclude the admission of otherwise admissible statements by a co-conspirator under Rule 801(d)(2)(E)."  *Singh*, 494 F.3d at 658 (citing *Mickelson*, 378 F.3d at 819 ("However, when the statements are those of a co-conspirator and are admissible under Federal Rule

of Evidence 801(d)(2)(E), the Sixth Amendment and *Bruton* are not implicated.")).

Therefore, "co-conspirators' statements made in furtherance of a conspiracy and admitted

under Rule 801(d)(2)(E) are generally non-testimonial and, therefore, do not violate the

Confrontation Clause as interpreted by the Supreme Court." *Id.* (citing *Crawford v.*

*Washington*, 541 U.S. 36, 51-54 (2004)); *see United States v. Lee*, 374 F.3d 637, 644 (8th

Cir. 2004) (applying *Crawford* in holding that casual statements to an acquaintance,

statements to a co-conspirator, and business records are not testimonial).

At this juncture, it is not clear what evidence the Government will actually seek to

introduce at trial or if any *Bruton* issues will in fact arise. *See United States v. Needham*,

No. 12-cr-206(5) (DWF/LIB), 2012 WL 6755386, at *4 (D. Minn. Dec. 10, 2012), *report*

*and recommendation adopted*, 2013 WL 25213 (D. Minn. Jan. 2, 2013); *United States v.*

*Billups*, 442 F. Supp. 2d 697, 706 (D. Minn. 2006).   But, in any event, these types of

evidentiary issues, and any appropriate responsive measures, are matters best left to the

sound discretion of the district court at trial.

### 3.  *Delatorre* & Workability Concerns

Relying on *United States v. Delatorre*, 522 F. Supp. 2d 1034 (N.D. Ill. 2007),

Mukhtar Mohamed Shariff argues that severance is warranted on grounds of fairness and

workability.   In *Delatorre*, 16 alleged gang members were charged with conspiracy to

engage in racketeering, including various violent crimes and narcotics and firearms

offenses over a "ten-year period."   522 F. Supp. 2d at 1037-42, 1050.   Fourteen

defendants were set for trial. *Id.* at 1037, 1042.   It was estimated that the prosecution's

case-in-chief "would last four to five months" and involve "at least 130 witnesses." *Id.* at 1037, 1050.

The district court largely rejected the defendants' traditional severance arguments under Rule 14.[18]  *Id.* at 1046-49; *see also id.* at 1049 ("no defendant has demonstrated the need for severance based on misjoinder or the traditional concerns of prejudice"), 1057 ("a joint trial will not prejudice defendants in a traditional sense").  Exercising its inherent authority, however, the district court found that severance was warranted based on "the special concerns about fairness of [a] 'mega-trial.'"  *Id.* at 1049.  The district court expressed concern over "considerable prejudice to the jury system and the jurors themselves," noting "[t]he human limitations of the jury system are especially tested during a lengthy trial," *id.* at 1050; the time delays associated with a large number of defendants; the months-long estimated length of trial; and procedural complications, including the logistics of a courtroom large enough to try the case.  *Id.* at 1049-54.  Concluding severance was warranted and that "one single consolidated trial would be prejudicial to the defendants and unworkable," the district court proceeded to consider several severance proposals put forth by the parties, ultimately dividing the case into two trials.  *Id.* at 1054-57.  Thus, although the district court "found that a joint trial w[ould] not prejudice [the] defendants in a traditional sense," it was "nevertheless seriously concerned by the systemic heavy burden that a fourteen-defendant case places on the

---

[18] Two of the three firearms offenses, however, were severed on grounds that the subject defendant would be prejudiced by the introduction of his prior murder conviction in connection with the felon-in-possession charges given "the conspiracy and murder counts in th[e] case."  *Delatorre*, 522 F. Supp. 2d at 1044.

criminal justice system and most importantly, on the jury system and jury selection process." *Id.* at 1057.

Mukhtar Mohamed Shariff's fairness concerns stemming from the practical considerations and administrative challenges inherent in managing the trial of a multi-defendant case are not lost on this Court. Such concerns, however, are best directed to the district court who will conduct the trial in this matter and within whose sound discretion a remedy may be fashioned if appropriate under the circumstances.[19]

### 4. Denial Without Prejudice

In sum, at this stage of the proceedings, Defendants have not met their burden to show that a joint trial will infringe upon their right to a fair trial or result in a clear likelihood of prejudice, and therefore their motions are denied. Even though severance is not appropriate at this time, developments may occur as this case moves closer to trial and even as the parties' strategies unfold during trial that may justify severance. The district court, within its sound discretion, can provide that remedy if appropriate under the circumstances at that time should it occur in the future. Thus, the denial of severance is without prejudice.

Finally, Defendants are reminded that even if they were to show prejudice in the future, the remedy would not necessarily be severance. As stated by the Supreme Court in *Zafiro*, "Rule 14 does not require severance even if prejudice is shown; rather it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."

---

[19] This is equally applicable to Mahad Ibrahim's concern over evidence pertaining to other related cases that the Government may seek to introduce at trial in this case.

506 U.S. at 538-39.  The Eighth Circuit has repeatedly held that "[t]he risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." *Mickelson*, 378 F.3d at 818; *see, e.g.*, *United States v. Sanchez-Garcia*, 685 F.3d 745, 754 (8th Cir. 2012) ("The risk of prejudice in a joint trial is best addressed by jury instructions . . . ."); *United States v. Boone*, 437 F.3d 829, 838 (8th Cir. 2006) ("Where multiple defendants are tried together, the risk of undue prejudice is best cured through cautionary instructions to the jury . . . ."); *Delpit*, 94 F.3d at 1144 ("The Supreme Court has made it clear that the risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions like those given by the District Court in this case.").

> **B. Abdiaziz Shafii Farah's Motion to Sever Counts, ECF No. 242, Mohamed Jama Ismail's Motion to Sever Defendants and to Sever Counts, ECF No. 252, Said Shafii Farah's Motion for Severance, ECF No. 263, and Mukhtar Mohamed Shariff's Motion for Severance of Defendants and Counts, ECF No. 248, are DENIED WITHOUT PREJUDICE.**

Abdiaziz Shafii Farah moves to sever the count charging him with making a false statement in a passport application.  Mohamed Jama Ismail, Said Shafii Farah, and Mukhtar Mohamed Shariff move to sever the federal-programs-bribery counts.

### 1. Passport Count

Count 43 charges Abdiaziz Shafii Farah with making a false statement in a passport application.  ECF No. 57 at 43.  Abdiaziz Shafii Farah asserts that Count 43 was not properly joined as it is not of a same or similar character as the other offenses, is not based on the same transaction or occurrence as the other offenses, and is neither connected with nor constitutes part of a common scheme or plan with the other offenses. Abdiaziz Shafii Farah additionally asserts that the evidence at trial on Count 43 will be

different than the evidence on the other counts, namely, whereas "[e]vidence around the first 42 counts would present complex questions of proof as to individual and business interactions relating to multiple federal child nutrition programs," the "[e]vidence around Count 43 would present unrelated questions . . . [regarding] whether [he] made a false statement in a passport application." ECF No. 244 at 4. In the alternative, Abdiaziz Shafii Farah asserts that Count 43 should be severed on grounds that the evidence presented in connection with the alleged fraud underlying the other counts would prejudice him and "irreversibly taint the jury as to Count 43." ECF No. 244 at 4.

The Government responds that Count 43 was "properly joined into a single indictment because the multiple offenses are connected with or constitute parts of a common scheme or plan." ECF No. 278 at 51-52. The Government responds that, at trial on Count 43, it "will introduce evidence of the [alleged] underlying fraud scheme because it is relevant to [Abdiaziz Shafii] Farah's motive and intent to obtain a new passport," and there will be "overlapping witnesses and testimony pertaining to both [Count 43] and the remaining counts." ECF No. 278 at 52; *see also* ECF No. 278 at 52 ("[E]vidence of the fraud scheme is relevant to the charged passport fraud count because it is evidence of [Abdiaziz Shafii] Farah's intent to fraudulently obtain a passport after his original passport was seized during a search of his residence and vehicles.").

Rule 8 "is broadly construed in favor of joinder to promote judicial efficiency." *McCarther*, 596 F.3d at 441-42; *see, e.g.*, *United States v. Mink*, 9 F.4th 590, 603 (8th Cir. 2021); *United States v. Reichel*, 911 F.3d 910, 915 (8th Cir. 2018). Joinder is proper where the charges are "factually interrelated." *Mueller*, 661 F.3d at 348; *see, e.g.*, *United*

*States v. Little Dog*, 398 F.3d 1032, 1037 (8th Cir. 2005); *United States v. Rock*, 282 F.3d 548, 552 (8th Cir. 2002); *see also United States v. Meyer*, No. 11-cr-299(1) (SRN/SER), 2011 WL 6888700, at *3 (D. Minn. Dec. 8, 2011) ("Generally, a substantive charge may be joined properly with a charge arising out of conduct calculated to hinder prosecution or escape liability on the original charge, because all the charges arise out of the same series of acts o[r] transactions."), *report and recommendation adopted*, 2011 WL 6888698 (D. Minn. Dec. 30, 2011). Here, Count 43 is factually interrelated to the charges associated with the alleged fraudulent scheme as evidence of the alleged fraudulent scheme is relevant to Abdiaziz Shafii Farah's motive and intent to obtain a new passport. *Cf. Little Dog*, 398 F.3d at 1037; *Rock*, 282 F.3d at 552; *Meyer*, 2011 WL 6888700, at *3.

"Prejudice may result from a possibility that the jury might use evidence of one crime to infer guilt on the other or that the jury might cumulate the evidence to find guilt on all crimes when it would not have found guilt if the crimes were considered separately." *United States v. Davis*, 103 F.3d 660, 676 (8th Cir. 1996); *accord Little Dog*, 398 F.3d at 1037. "On the other hand, a defendant does not suffer any undue prejudice by a joint trial if the evidence is such that one crime would be probative and admissible at the defendant's separate trial of the other crime." *Davis*, 103 F.3d at 676; *accord Little Dog*, 398 F.3d at 1037; *see United States v. Wilkens*, 742 F.3d 354, 358 (8th Cir. 2014). Because evidence of the alleged fraud scheme would be probative at a separate trial on Count 43, Abdiaziz Shafii Farah has not shown the requisite prejudice.

### 2. Federal-Programs-Bribery Counts

Count 13 charges Abdiaziz Shafii Farah, Said Shafii Farah, and Mukhtar Mohamed Shariff with conspiracy to commit federal programs bribery. *See generally* ECF No. 57 at 32-35. Counts 14 through 19 charge these same Defendants with federal programs bribery.[20] Mohamed Jama Ismail, Said Shafii Farah, and Mukhtar Mohamed Shariff assert that "the jury will be unable to compartmentalize the evidence of alleged bribery from that of conspiracy to commit wire fraud and money laundering," ECF No. 252 at 4, and "there is a real possibility that jurors will use evidence presented on the wire fraud and money laundering counts to infer guilt on [the federal-programs-bribery counts]," ECF No. 263 at 4; *see* ECF No. 252 at 4 ("[T]here is real concern that the jury will simply lump together more than one alleged conspiracy as one and not compartmentalize the different alleged agreements to defraud that may not be related."); ECF No. 249 at 14 (concern for "spillover effect" from "evidence related to the wire fraud and money laundering allegations to infer guilt on . . . the bribery allegations").

The Government responds that "evidence of the alleged fraud conspiracy is probative of the charged bribery counts, and evidence of the alleged bribes is probative of the charged fraud conspiracy." ECF No. 278 at 51. The Government further responds that Defendants have not shown that the risk of any prejudice cannot be cured through jury instructions.

---

[20] Abdiaziz Shafii Farah is charged with two counts (Counts 14 and 17), Said Shafii Farah is charged with three counts (Counts 16, 18, and 19), and Mukhtar Mohamed Shariff is charged with one count (Count 15). ECF No. 57 at 36.

It cannot be seriously argued that the federal-programs-bribery counts are not factually interrelated with the wire-fraud and money laundering counts. The alleged bribery is one of the means by which the necessary sponsorship was allegedly obtained to participate in the federal program Defendants are alleged to have defrauded. As such, evidence related to the alleged fraudulent scheme would be probative and admissible in any trial on the alleged federal-programs-bribery counts. Given the significant overlap and interplay of these charges, Defendants have not, at this juncture, overcome the strong presumption of a joint trial, *see McCarther*, 596 F.3d at 442, or persuasively explained why, even if prejudice were to arise at trial, such prejudice could not be cured by carefully crafted jury instructions, *see May*, 70 F.4th at 1071; *Spotted Elk*, 548 F.3d at 658.

### C. Mahad Ibrahim's Motion for Bill of Particulars, ECF No. 255, and Mukhtar Mohamed Shariff's Motion for Bill of Particulars, ECF No. 236, are DENIED.

Mahad Ibrahim and Mukhtar Mohamed Shariff each move for a bill of particulars. The Government responds that the Superseding Indictment "goes far beyond what is legally required" with "lengthy and detailed" allegations that "explain[] the specific roles . . . [the] defendants played in the charged crimes." ECF No. 278 at 21. The Government also states that it has "provided voluminous discovery, including more than 150 interview reports and dozens of lengthy and detailed search warrant affidavits that lay out the fraud scheme, [D]efendants' roles in it, and probable cause to search the locations and email accounts used in connection with the alleged crimes." ECF No. 278 at 28.

"The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."  Fed. R. Crim. P. 7(c)(1).

> An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution.

*United States v. Wessels*, 12 F.3d 746, 750 (8th Cir. 1993).  "An indictment is sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted."  *United States v. Milk*, 66 F.4th 1121, 1133 (8th Cir. 2023) (quotation omitted).

> A bill of particulars serves to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment is too vague and indefinite.

*United States v. Hernandez*, 299 F.3d 984, 989-90 (8th Cir. 2002); *accord Beasley*, 688 F.3d at 532; *see Milk*, 66 F.4th at 1133; *United States v. Livingstone*, 576 F.3d 881, 883 (8th Cir. 2009).  "If a defendant believes that an indictment does not provide enough information to prepare a defense, then he or she may move for a bill of particulars."  *Livingstone*, 576 F.3d at 883 (citing Fed. R. Crim. P. 7(f)).

"A bill of particulars, however, is not a proper tool for discovery," and "it is not to be used to provide detailed disclosure of the government's evidence at trial."  *Wessels*, 12 F.3d at 751; *see also, e.g.*, *Milk*, 66 F.4th at 1133; *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011); *Livingstone*, 576 F.3d at 883.  "The district court, in its

discretion, may order the government to provide requested additional detail where the particulars set out in the indictment fail sufficiently to apprise the defendant of the charges to enable him to prepare a defense." *United States v. Garrett*, 797 F.2d 656, 665 (8th Cir. 1986); *see United States v. Stephenson*, 924 F.2d 753, 762 (8th Cir. 1991) ("The trial court has broad discretion in granting or denying a bill of particulars."). "[A]t the pre-trial stage, courts considering whether to grant a motion for a bill of particulars ask whether the defendant has been adequately informed of the charges such that he can prepare a defense and avoid surprise at trial." *United States v. Belfrey*, No. 14-cr-373 (ADM/TNL), 2016 WL 1301085, at *2 (D. Minn. Apr. 1, 2016).

### 1. Mahad Ibrahim

Mahad Ibrahim moves for a bill of particulars in connection with Count 1, which charges him and his co-defendants with conspiracy to commit wire fraud. Mahad Ibrahim asserts that, in order "[t]o be confident that [he] has notice of the charge brought against him and to be sure the [G]overnment has met its burden of proof at each stage of the case against him, [he] is entitled to know more about the nature of the fraud he allegedly committed." ECF No. 256 at 3. Pointing to the following three paragraphs of factual allegations, Mahad Ibrahim seeks to know what portion of the meals referenced and the funds alleged to have been obtained were fraudulent:

> 37. At times, MAHAD IBRAHIM and his co-conspirators fraudulently claimed to be serving meals to more than 25,000 children a day at the ThinkTechAct[21] and Mind Foundry[22] sites in 2021. Based on these fraudulent claims,

---

[21] ThinkTechAct Foundation, ECF No. 57 at 7.
[22] Mind Foundry Learning Foundation, ECF No. 57 at 7.

> ThinkTechAct and Mind Foundry received more than $18 million in Federal Child Nutrition Program funds from Sponsor A and an additional $3.7 million from Feeding Our Future.
>
> . . .
>
> 47. In total, the defendants fraudulently received approximately $40 million in Federal Child Nutrition Program funds between approximately May 2020 and January 2022.
>
> . . .
>
> 63. On or about October 5, 2021, ABDIMAJID NUR sent an email to Sponsor A with the subject line "September TTA & FMI Invoices." Attached to the email were invoices from both ThinkTechAct and The Free Minded Institute for September 2021. The invoices falsely claimed that ThinkTechAct had served a total of 367,556 meals to children at 14 sites in September 2021 and that The Free Minded Institute served an additional 46,825 meals at three sites that same month. The invoice further claimed that ThinkTechAct was entitled to $1,635,624 in Federal Nutrition Program funds and that The Free Minded Institute was entitled to $208,371 in additional federal funds.

ECF No. 57 at 11, 14, 18.

The Superseding Indictment contains detailed factual allegations regarding Mahad Ibrahim's alleged involvement in the alleged conspiracy to commit wire fraud and "carry out a fraudulent scheme to obtain millions of dollars in Federal Child Nutrition Program funds by causing the submission of fraudulent information, including falsified meal count records with substantially inflated figures." ECF No. 57 at 10. There are multiple paragraphs describing Mahad Ibrahim's alleged connection to and involvement with ThinkTechAct and Mind Foundry as well as other entities and his co-defendants along

with the acts Mahad Ibrahim was allegedly involved in to further the alleged conspiracy. *See, e.g.*, ECF No. 57 at 7, 11, 16, 20-21, 25-27. The Superseding Indictment informs Mahad Ibrahim of the nature of the wire-fraud conspiracy charge with sufficient precision to enable him to prepare for trial. *See Milk*, 66 F.4th at 1133. As has been repeatedly discussed, the Government has provided extensive discovery in this matter. Although the Court has ordered the Government to narrow that discovery down in preparation for trial, *see supra* Section II.A, this discovery combined with the information set forth in the Superseding Indictment is "more than sufficient to enable [Mahad Ibrahim] to understand the nature of the charges, prepare a defense, and avoid unfair surprise." *Huggans*, 650 F.3d at 1220; *see Milk*, 66 F.4th at 1133.

### 2. Mukhtar Mohamed Shariff

Mukhtar Mohamed Shariff moves for a bill of particulars on Counts 13 and 15, which relate to federal-programs bribery. Count 13 charges Mukhtar Mohamed Shariff and two of his co-defendants with conspiracy to commit federal programs bribery by paying Individual I.M., among others, "in exchange for sponsoring . . . the[] fraudulent participation in the Federal Child Nutrition Program." ECF No. 57 at 32; *see* ECF No. 57 at 32-35. Count 15 charges Mukhtar Mohamed Shariff with federal programs bribery for a payment in the amount of $250,000 made to Individual I.M. by Afrique Hospitality Group. ECF No. 57 at 36. Mukhtar Mohamed Shariff is alleged to be the CEO of Afrique Hospitality Group. ECF No. 57 at 9.

Mukhtar Mohamed Shariff acknowledges that the Superseding Indictment "lays out the bare bones of a federal funds bribery count." ECF No. 238 at 5. He asserts,

however, that the Superseding Indictment does not include anything "about the position [Individual I.M.] is said to have had with Feeding Our Future," "including whether the position had any policy or decision making authority, in particular with respect for [sic] who could participate in the Federal Child Nutrition Program."  ECF No. 238 at 5.  Mukhtar Mohamed Shariff additionally asserts that there is nothing in the Superseding Indictment "as to how the [alleged $250,000] payment was in connection with Afrique [Hospitality Group]'s participation in the Federal Child Nutrition Program."  ECF No. 238 at 5.  Mukhtar Mohamed Shariff requests that the Government be ordered to answer how Individual I.M. was an employee or agent of Feeding Our Future; how the alleged payment was in exchange for Individual I.M.'s role in sponsoring or facilitating the alleged fraudulent participation in the Federal Child Nutrition Program; and how Individual I.M. sponsored or facilitated the alleged fraudulent participation in the Federal Child Nutrition Program.

As touched on above, *see supra* Section II.B, the Superseding Indictment explains, generally speaking, that organizations and entities wanting to participate in the Federal Child Nutrition Program "must be sponsored by an organization that is authorized to participate in the Federal Child Nutrition Program"; these "[s]ponsors are responsible for monitoring each of their sites and preparing reimbursement claims [to MDE] for their sites"; and "MDE provides the federal funds to the sponsoring agency, which in turn pays the reimbursement funds to the sites under its sponsorship."  ECF No. 57 at 2-3.  The Superseding Indictment explains that "Feeding Our Future was an approved sponsor of the Federal Child Nutrition Program."  ECF No. 57 at 4.

The Superseding Indictment alleges that "Feeding Our Future employees solicited and received bribes and kickbacks from individuals and sites under the sponsorship of Feeding Our Future," essentially "operat[ing] a 'pay-to-play' scheme in which individuals seeking to operate fraudulent sites under the sponsorship of Feeding Our Future had to kick back a portion of their fraudulent proceeds to Feeding Our Future employees," and "[m]any of these kickbacks were paid in cash or disguised as 'consulting fees' paid to shell companies created by Feeding Our Future employees to conceal the true nature of the payments and to make them appear legitimate."  ECF No. 57 at 5; *see* ECF No. 57 at 32-33 ("object and purpose of the conspiracy was to enable individuals and entities participating in the fraudulent scheme to obtain Federal Child Nutrition Program funds to pay bribes and kickbacks to a Feeding Our Future employee, in exchange for Feeding Our Future's sponsorship of their fraudulent participation in the Federal Child Nutrition Program"); *see also* ECF No. 57 at 33 ("Employees who worked at Feeding Our Future . . . solicited and accepted bribes and kickbacks from individuals involved in the Federal Child Nutrition Program in exchange for sponsoring their fraudulent participation in the Federal Child Nutrition Program.").

Individual I.M. is identified as a "Feeding Our Future employee who solicited and received bribes and kickbacks from individuals and companies involved in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future."  ECF No. 57 at 9-10.  The federal-programs-bribery counts allege that Mukhtar Mohamed Shariff paid $250,000 to Individual I.M. as a "bribe/kickback" "in exchange for her role in sponsoring and facilitating his and his co-conspirators fraudulent participation in the Federal Child

Nutrition Program."  ECF No. 57 at 33; *see also* ECF No. 57 at 34, 36.

Here, the Superseding Indictment informs Mukhtar Mohamed Shariff of the nature of the federal-programs-bribery charges with sufficient precision to enable him to understand the charges, prepare a defense to those charges, and avoid or minimize the danger of unfair surprise at trial.  *See United States v. Afremov*, No. 06-cr-196 (JRT/SRN), 2007 WL 2475972, at *2 (D. Minn. Aug. 27, 2007) (no bill of particulars needed where indictment "identifies with particularity the primary elements of a 'garden variety' kickback scheme, including the relevant transaction dates, the payer and payee information, and the specific dollar amounts in question"); *see also Milk*, 66 F.4th at 1133.  As noted above, "[a] bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial," and that is essentially what Mukhtar Mohamed Shariff is seeking here. *Huggans*, 650 F.3d at 1220 (quotation omitted); *see also, e.g.*, *Milk*, 66 F.4th at 1133; *Livingstone*, 576 F.3d at 883; *Wessels*, 12 F.3d at 751.

[Continued on next page.]

## IV. PRIOR ORDERS & REMEDIES

All prior consistent orders remain in full force and effect.  Failure to comply with any provision of this Order or any other prior consistent Order shall subject the non-complying party, non-complying counsel and/or the party such counsel represents to any and all appropriate remedies, sanctions and the like.

Date: December  19  , 2023

_____ *s/ Tony N. Leung* _____
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*United States v. Farah et al.*
Case No. 22-cr-124 (NEB/TNL)